IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-cr-21 |
| | |
| | UNITED STATES DISTRICT JUDGE |
| v. | DAVID S. CERCONE |
| | |
| LAWRENCE W. NELSON | UNITED STATES MAGISTRATE JUDGE |
| | RICHARD A. LANZILLO |
| | |
| | ORDER ON DEFENDANT'S |
| | EMERGENCY MOTION FOR RELEASE |
| | PENDING SENTENCING |
| | [ECF NO. 38] |

AND NOW, this 8th day of May, 2020, it is hereby ORDERED that Defendant Lawrence W. Nelson's Emergency Motion for Release Pending Sentencing in Light of COVID-19 Pandemic is DENIED for the reasons set forth below.

I. Background

On August 13, 2019, a federal grand jury returned an indictment charging Mr. Nelson with one count of Infliction of Bodily Injury in violation of 18 U.S. C. §111(a)(1) and (b). The indictment alleged that on July 10, 2019, while Mr. Nelson was incarcerated at the Federal Correctional Institution at McKean, Pennsylvania (FCI-McKean), he struck a correctional officer with his closed fist, breaking her nose and causing facial contusions. At the time of the acts alleged in the indictment, Mr. Nelson was serving a twelve-year federal sentence for a 2003 conviction for conspiracy to possess with intent to distribute cocaine and cocaine base.

On August 29, 2019, Mr. Nelson made his initial appearance before the Court, at which time he entered a plea of not guilty to the sole count of the indictment and waived his right to a detention hearing. The Court granted the Government's request for detention. Thereafter, on December 13, 2019, Mr. Nelson filed a motion for a detention hearing, which the Court conducted on

1

December 20, 2019. On December 23, 2019, the Court entered an Order detaining Mr. Nelson pending trial.

On January 3, 2020, Mr. Nelson withdrew his plea of not guilty and entered a plea of guilty to the sole count of the indictment. During the change of plea hearing, Mr. Nelson admitted to striking the corrections officer at FCI-McKean and acknowledged that he faced a term of imprisonment of not more than 20 years for the offense. The Court accepted Mr. Nelson's guilty plea and proceeded to find him guilty of the offense and ordered that he remain in custody pending sentencing, which is scheduled for May 18, 2020. ECF No. 20.

On April 10, 2020, Mr. Nelson filed an Emergency Motion for Release Pending Sentencing, requesting that the Court release him from detention at the Northeast Ohio Correctional Center (NEOCC) to the custody of his long-time partner, Mistie Reza, at her home outside of Morgantown, West Virginia, or to the custody of his mother, Patricia Streets, who resides in Charleston, West Virginia. Mr. Nelson asserts that the threat of the coronavirus spreading within NEOCC and his preexisting medical conditions of hypertension and borderline diabetes warrant his release pending sentencing.

Mr. Nelson bases his request for relief on 18 U.S.C. §3142(i), which authorizes temporary release of a detainee upon his showing a "compelling reason" necessitating such release and, alternatively, on 18 U.S.C. §3145(c), which permits release pending sentence of some defendants "upon a showing of 'exceptional reasons' why incarceration is inappropriate." *United States v. Schlesinger*, 2005 WL 1657043 at *2 (E.D.N.Y. June 8, 2005). Mr. Nelson also contends that circumstances compel his release based upon Fifth Amendment due process considerations.

The Government initially argued that Mr. Nelson's continued detention is mandated by 18 U.S.C. §3143(a)(2), which provides that the "judicial officer ***shall order*** that a person who has been

2

found guilty of [certain offenses involving crimes of violence] and awaiting imposition of execution of sentence be detained unless…(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and …the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." (emphasis added). An assault in violation of 18 U.S.C. §111(b) qualifies as one of the crimes of violence within the scope of §3143(a)(2), and Mr. Nelson does not argue that is he is eligible for release under either of its exceptions to mandatory detention. Instead, Mr. Nelson argues that notwithstanding the provisions of §3143(a)(2), a defendant is subject to release under §3142(i) or §3145(c) if he makes the required showing under either. Because the Court finds that Mr. Nelson has not demonstrated a "compelling reason" necessitating his temporary release or "exceptional reasons" for his release, it need not address the interplay among the foregoing provisions.

II. Discussion

   A. NEOCC

The total inmate and detainee population at NEOCC is approximately 1,626 souls.[1] To date, no inmate or detainee at NEOCC has tested positive for the coronavirus. Approximately 59% of NEOCC's population are state inmates and the remainder are federal detainees like Mr. Nelson. The state inmates and federal detainees are housed separately within the facility and do not interact. Currently, NEOCC is only receiving new federal detainees. All are screened before they are

---

[1] During the hearing on Mr. Nelson's motion, both his counsel and the Government's counsel repeatedly referred to testimony of NEOCC personnel from a detention hearing in *United States v. Tyrone Pratt*, 2:19-cr-213. Given their proffers and partial reliance on that testimony, both counsel consented to this Court reviewing and considering that testimony as part of the record in this case. Much of the information in this Order concerning conditions and practices within NEOCC is taken from the transcript of that proceeding.

accepted into the facility. If a detainee has a temperature over 100.4 degrees, he is not accepted into the facility. If any detainee on a transport fails the screening, all detainees on that transport are sent back to their departure points. Detainees who arrive and are cleared for entry are assigned to two intake pods where they are segregated from the general prison population for fourteen days before transfer to the general prison population. New entrants to the NEOCC also go through an initial medical assessment. Any detainee or inmate who leaves the facility for a medical appointment or other reason is quarantined in a single cell within the restricted housing unit of the facility for fourteen days upon his return. Any inmate who complains or shows any symptoms of COVID-19 is referred to the medical department and the warden or deputy warden is notified.

NEOCC posts signage throughout the facility and conducts town hall meetings with each housing unit twice per week to emphasize mitigation protocols such as handwashing and social distancing and to distribute masks and hand soap. All inmates and detainees are encouraged to maintain social distance, but no disciplinary action is taken against those who do not. Federal detainees are normally housed in double cells. Meals are provided to one housing unit at a time. Each housing unit has 64 detainees who enter a main hallway and then file through a portable serving line where they receive their meals before returning to their housing unit. Meals are served by other inmates who must wear masks and gloves. Each housing unit has only five showers to serve its 64 inmates.

Federal detainees are strongly encouraged to wear masks. Although masks are not required for the general population, most inmates wear them when they leave their housing units. Two housing units, or a total of 128 detainees, participate in recreation at a time. Inmates also must line up for medication distribution and occasionally to use the telephone. Again, social distancing in these contexts is encouraged but not enforced through discipline.

The federal detainee side of the facility has two negative pressure rooms available in the event any federal detainee is confirmed or suspected of COVID-19. In addition, NEOCC has two vacant housing units, B6 and B8, that are ready to accommodate and isolate in single cells up to an additional 56 positive cases, if necessary. COVID-19 tests are available at NEOCC and are administered based upon the facility's understanding of CDC guidelines. Between twelve and fifteen medical staff are available at the facility during a day shift. PODs within NEOCC are currently disinfected every two hours. This includes a porter spraying all high-touch areas with sanitizer and wiping down all surfaces. This process is then recorded in a logbook to ensure compliance. This practice also serves as a reminder for the staff and detainees to wash their hands.

NEOCC normally maintains a total staff of 461 employees, not including transportation staff, with between 250 and 324 individuals in and out of the facility each day. Staff, contractors and vendors entering NEOCC are also screened for temperature, contact with individuals with diagnosed coronavirus, and symptoms such as coughing, wheezing and shortness of breath. Social distancing procedures are maintained for personnel entering the facility, including screening tents outside the facility's front gate, limitations on the number individuals entering common areas at one time, and markings to keep individuals at least six feet apart. All staff members within NEOCC are currently required to wear masks.

Three cases of coronavirus have been reported among personnel at NEOCC. Two involved staff members; the other was a contractor to the facility. All three have been quarantined from the facility. Following the two employees testing positive for coronavirus on April 8 and 9, NEOCC conducted contact tracing and, based on that tracing, excluded an additional eleven employees or contractors from the facility for a period. This contact tracing also included inmates and resulted in

one inmate being placed in quarantine. As of April 28, NEOCC was in the process of conducting contact tracing concerning the third staff member or contractor who tested positive for the virus.

Social distancing is encouraged but not always possible for correctional officers during a shift. For example, if officers are required to intervene in an inmate altercation, social distancing may not be possible. Otherwise, during staff breaks and meals, employees are not permitted to congregate.

NEOCC is located Mahoning County, Ohio. The most recent data available to the Court for Mahoning County report 1,024 confirmed cases of coronavirus and 108 deaths. The Court acknowledges that these numbers may be significantly under-reported.

    B. The Risks of COVID-19

Dr. Homer Venters, a physician, internist and epidemiologist with extensive experience in providing, improving and leading health services for incarcerated people, provided an affidavit and testified on behalf of Mr. Nelson. He described the magnitude and impacts of the coronavirus pandemic on a national and local level. He explained that when COVID-19 enters a community it inevitably will find its way into correctional facilities in that community and once inside a facility correctional health and security personnel will be unable to stop it from spreading rapidly among the prison population. Dr. Venters relied in part on anonymous surveys of inmates and personnel within NEOCC in support of his critique of practices within the facility. Such surveys have only minor value and relevance because neither their design, sample size nor sample representation is scientifically sound. Nevertheless, the Court accepts that NEOCC mitigation practices and measure, while substantial, are far from perfect.

Dr. Venters reviewed unspecified medical records of Mr. Nelson and observed that his "medical information indicates that he has hypertension for which he is prescribed two medications,

6

as well as a recent reports (sic) of abdominal symptoms, diagnosis of irritable bowel syndrome, gastric reflux, anemia, constipation and post-traumatic stress disorder." Dr. Venters also noted that Mr. Nelson reported he had experienced a dry cough. Based upon Mr. Nelson's hypertension, Dr. Venters concluded that he "meets CDC criteria to be considered as high risk for serious illness or death from COVID-19."[2] Dr. Venters did not indicate that Mr. Nelson is diabetic or discuss the efficacy of his two medications in controlling his high blood pressure. In his affidavit and testimony, Dr. Venters expressed his belief that NEOCC categorizes the medical conditions of inmates in a manner that fails to identify many inmates who should be considered "high risk" for COVID-19. *See* ECF No 45-2, pp. 14-15. He was particularly critical of how NEOCC policies evaluate asthma and diabetic patients. Based upon his interpretation of CDC criteria, he opined that one-quarter to one half of all detainees at NEOCC should be considered "high risk." *Id.*, p. 15.

Johnathan Louis Golob, a specialist in infectious diseases and internal medicine at the University Michigan School of Medicine in Ann Arbor, Michigan, also provided an affidavit that was submitted on behalf of Mr. Nelson. Dr. Golob identified "[p]eople over the age of fifty ... at higher risk, with those over 70 at a serious risk" of severe illness from COVID-19. He also identified "medical conditions that increase the risk of serious COVID-19 for people of any age" as including "those with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune diseases, blood disorders (including sickle cell disease, chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay or pregnancy."

---

[2] Dr. Venters' affidavit also identified individuals who are smokers as being at higher risk of COVID-19 complications. (ECF No. 45-2, p. 6). There is no indication that Mr. Nelson is a smoker. During the videoconference hearing on this matter, however, Ms. Reza, the proposed custodian for Mr. Nelson was observed smoking a cigarette within the home where Mr. Nelson is to reside if released.

7

The CDC identifies "those at high-risk for severe illness from COVID-19" as including "[p]eople of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have *serious heart conditions*
- People who are immunocompromised
  o Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (emphasis supplied).

The CDC's list of "serious heart conditions" includes "pulmonary hypertension," but not general hypertension. "Pulmonary hypertension is a type of high blood pressure that affects the arteries in your lungs and the right side of your heart." https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697. "While in regular hypertension (also known as high blood pressure), the arteries throughout the body are constricted, [pulmonary hypertension] primarily affects the blood vessels in the lungs, making the right side of the heart work harder." https://phassociation.org/patients/aboutph/types-of-ph/. Data from other countries battling the coronavirus epidemic have documented, however, that individuals with general hypertension are at an elevated risk of death relative to the general population. But the American Journal of Hypertension recently reported that "there is as yet no evidence that hypertension is related to outcomes of COVID-19, or that [typical hypertension medication] use is harmful, or for that matter beneficial, during the COVID-19 pandemic." Ernesto L Schiffrin, John M Flack, Sadayoshi Ito, Paul Muntner, R Clinton Webb, Hypertension and COVID-19, American

Journal of Hypertension, Volume 33, Issue 5, pp. 373-374 (May 2020) (available at https://doi.org/10.1093/ajh/hpaa057).

III.     Conclusion

After considering all evidence and proffers of the parties, the Court finds that the facts do not support a finding of a "compelling reason" necessitating Mr. Nelson's temporary release under 18 U.S.C. §3142(i) or "exceptional reasons" for release pending sentence under 18 U.S.C. §3145(c). Recently, District Judge Cathy Bissoon of this Court reviewed circumstances at NEOCC and held that the defendant in that case had "not yet demonstrated that circumstances at NEOCC have become so dire as to create a level of 'exceptionality' that directs relief at this point." *United States v. Marquis Brown*, No. 2:18-cr-00077 (W.D. Pa. April 9, 2020) (ECF No. 70, p.5) (citing *United States v. Raia*, App. No. 20-1033 at *8 (3d Cir. Apr. 2, 2020)). This conclusion continues to apply in this matter. Although two staff members and one contactor at NEOCC have tested positive for the coronavirus, the facility acted promptly to identify through contact tracing individuals who are likely to have been exposed to them and to exclude or quarantine the infected individuals and their contacts for a period of time necessary to mitigate the risk of spreading the virus to the general prison population. While not perfect, NEOCC has taken significant actions to mitigate the risk of the coronavirus spreading in the facility and to prepare to respond effectively in the event inmates become infected. NEOCC personnel have a powerful incentive to abide strictly by the policies, procedures and guidelines in place. Each day they enter the facility they face risks similar to those of the inmates they serve. Any failure to follow mitigation procedures would place not only themselves but their families at greater risk of infection. While it is true that, unlike Mr. Nelson, NEOCC personnel face this risk voluntarily, their incentive to mitigate the risk for themselves and inmates remains strong.

Further, the concerns expressed on behalf of Mr. Nelson remain too generalized to permit his release under §3145(c) or §3142(i). As Dr. Venters testified, he considers between one-quarter and one-half of the population at NEOCC to be at high risk of COVID-19 complications. As this consideration applies to a broad category of individuals, Mr. Nelson's situation cannot be considered exceptional. *See Marquis Brown*, No. 2:18-cr-00077 (ECF No. 70, p.4) (citing *United States v. Jones*, 2020 WL 1674145, at *3 (W.D. Pa. Apr. 6, 2020) ("Most courts have defined exceptional under § 3145(c) as clearly out of the ordinary, uncommon, or rare."); *United States v. Sotelo*, 2016 WL 4191022, at *5 n.30 (E.D. Pa. Aug. 4, 2016) ("exceptional requires something out of the ordinary to distinguish the defendant's case from those of [other defendants] subject to mandatory detention")). While the Court does not underestimate the potential for the coronavirus to make its way from the community into NEOCC, and acknowledges that it already may have done so, the risks it presents apply across much, if not all, of the prison population. In addition, Mr. Nelson's sentencing hearing is scheduled for May 18, 2020, and his further confinement, if any, will likely be determined at that time. The imminence of the sentencing hearing further negates any rationale for immediate release to either of the proposed custodians in West Virginia.

Finally, Mr. Nelson's conditions of confinement do not violate constitutional requirements. Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment where they act with deliberate indifference to serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97 (1976) (internal quotation omitted). Here, however, NEOCC personnel continue to take significant actions to mitigate the risks of the coronavirus to Mr. Nelson and the other inmates at NEOCC. No showing of deliberate indifference to Mr. Nelson's health has been made in this case.

IT IS SO ORDERED.

/s/ Richard A. Lanzillo
RICHARD A. LANZILLO
United States Magistrate Judge

Dated:     May 8, 2020